# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* NEAHUSAN, Minors.

UNPUBLISHED
September 18, 2018

No. 340249
Genesee Juvenile Division
LC No. 13-129756-NA

Before: O'CONNELL, P.J., and CAVANAGH and SERVITTO, JJ.

PER CURIAM.

Respondent mother appeals as of right an order terminating her parental rights to her four children pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (other conditions exist), (g) (parent failed to provide proper care and custody), and (j) (reasonable likelihood of harm). We affirm.

Respondent had a history of child protective proceedings that predates this current action. In February 2013, a petition was filed by the Genesee County Department of Human Services (DHS) seeking the removal of the children from respondent's custody. The petition noted that another child protective case was opened in June 2011 after respondent and her then-husband physically attacked the children's father. The petition further stated that respondent was addicted to Dilaudid. The petition noted that, in May 2012, another child protective case was opened after several domestic violence incidents between respondent and her then-husband were witnessed by the children. In June 2013, however, the court entered an order following a dispositional review hearing declaring that jurisdiction was terminated and the children were released to their parents.

This current action was commenced on November 6, 2015, when another petition was filed by the Genesee County DHS which sought the removal of the children from both parents. Respondent had been arrested with heroin on her person while with her four children. The petition noted that respondent and the children were living with the children's father because respondent was homeless due to her severe substance abuse problem. Respondent had been evicted from her parents' home for stealing over $140,000. And, the petition stated, the children's father's home was unsuitable for habitation because it had no running water or electricity. Further, the children did not regularly attend school, accruing about 30 absences from September 25 to October 26, and the children were left unsupervised by an adult for hours at a time. The petition indicated that respondent had numerous prior contacts with child protective services and sought to make the children temporary court wards. During the pendency of these proceedings, respondent was in jail on various charges and the children were placed with a foster care family. In January 2016, respondent submitted to the court's jurisdiction.

-1-

After respondent's release from jail in March 2016, she participated in both inpatient and outpatient substance abuse treatment. While she was inpatient, she had unsupervised visitation with the children but failed to properly supervise them. After respondent left the drug program, she failed to maintain contact with DHS for a period of time. Then in July 2016, respondent went to jail again for unlawful use of a motor vehicle. At an October 2016 hearing, respondent remained in jail. The court was advised that the children were doing very well in their foster home and in school, and they did not want to be reunited with either of their parents. The children's attorney requested that the goal change from reunification to termination and the court authorized the filing of a petition for termination.

By the time of the hearing held in December 2016, respondent was out of jail and living in Traverse City. She had a job and was renting a two bedroom house. Her drug screens were negative and she was participating in parenting time visits. However, at the hearing held in January 2017, the children's attorney advised the court that the children wanted parenting time with respondent to be reduced or completely stopped because respondent was rude to them and to the caseworker who supervised the visits so the children did not enjoy the visits. The court then ordered a counselor, Patricia Green, to attend the parenting time visits.

Although the termination trial was scheduled to begin on March 2, 2017, it was adjourned to allow Green additional time to work with the family. At that hearing, respondent testified that she moved into a bigger home which she was leasing and had planned to purchase. The landlord's name was Todd Respecki. Since October 2016, she had worked full time for Cherry Capital Services and netted $812 a week. Cherry Capital owned the home where respondent lived and the president was Todd Respecki.

At the May 2017 review hearing, however, the court was advised that during respondent's home study it was discovered that respondent got married to Todd Respecki on March 17, 2017—shortly after the last hearing. And Respecki was a convicted sex offender in that he had been convicted about 21 years ago of "two third-degree charges of persons 13 to 15, and one fourth degree charge with a person 13 to 15." Respondent did not disclose this recent marriage to DHS or to the children until after DHS discovered this information. Further, at the home study, it was discovered that Respecki had a son who also lived in the home. Accordingly, DHS recommended that this matter proceed to the termination trial.

A hearing was held on June 30, 2017, at which time DHS stated that it had filed a supplemental petition for termination based on a risk assessment completed by John Neumann, a licensed social worker, related to respondent living with a sex offender. It was noted that the evaluation showed respondent's husband was at low risk for sexual recidivism, but there were serious concerns because Respecki did not have full knowledge of respondent's DHS history, criminal history, and substance abuse history. The supplemental petition sought termination under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), and it was authorized at a subsequent hearing on July 5, 2017.

At a hearing held on July 18, 2017, it was announced that respondent was in the Alpena County Jail. She turned herself in on an old warrant for a charge of retail fraud and was sentenced to 30 days in jail. Thus, the contested pretrial hearing was adjourned. At a review hearing held on July 26, 2017, it was noted that a recent psychological evaluation indicated that

respondent should have individual psychological counseling to address a mild personality disorder and she had not done that so far. While respondent's counsel requested that respondent have expanded visitation after she was released from jail, the children's attorney responded that respondent's decision to marry someone who she knew was a pedophile illustrated irresponsible decision-making so even severing the relationship with her husband might not change the posture of the case.

On August 8, 2017, the final pretrial hearing was conducted and the caseworker reported that the children refused to go to parenting time with either parent and they also refused to speak with them on the telephone. The children's attorney requested that parenting time be suspended and the court granted the request.

On August 16, 2017, the termination trial began as to respondent, only. In brief, Neumann, who conducted a risk assessment regarding respondent's husband as discussed above, testified that Respecki was at low risk for sexual recidivism. However, Neumann had serious concerns because Respecki did not have full knowledge of respondent's DHS history, criminal history, and substance abuse history. That Respecki could marry respondent not knowing that she was in the process of having her parental rights terminated, which was an extremely serious matter, was quite concerning. Respecki testified that he was absolutely not a risk to anyone in the community or to respondent's children. He had spent five years in prison, went to sex offender group therapy while incarcerated, and then went to one-on-one counseling after prison for several months. He did meet respondent's oldest child at a choir concert and she gave him a hug. Respecki also testified that he had since learned about respondent's history and the conditions placed on her by these proceedings and was committed to helping her. He also had a 13-year old son.

The counselor who supervised respondent's visitations with the children, Patricia Green, testified that she had worked with this family since January 2017.[1] She noticed that respondent did not focus on what was going on with the kids, how they were doing, how they were coping, how school was; rather, respondent talked mostly about what material things the kids wanted. Respondent also did not correct the children, discipline them, or set limits with them. Green believed that if respondent had benefited from parenting classes, she would have seen respondent talking to the children about themselves and their feelings, what they were doing and setting limits with them, but Green had not observed much of that. Green also noted that at a visit in April, respondent showed the children pictures of her house and the children had noticed their picture on a wall as well as a picture of another boy who they did not know. Respondent told them the boy was a friend's son and did not tell them that he was her stepson. Respondent also told the children that she lived alone, which was a lie. One of the children looked up the "friend's" name on the internet, Respecki, and discovered that he was a sex offender. Respondent had not disclosed to the children that she was married to, or even in a relationship with, Respecki before this time and the children were upset for their safety and by the fact that

---

[1] Green had also worked with this family in April 2013 but the sessions ended when that previous case was closed.

she had lied to them. Respondent's marriage should have been disclosed to the DHS caseworker so that it could be handled properly. Green also knew that respondent was diagnosed with a mild personality disorder and opined that it would take a couple of years to address that issue. She thought respondent should have counseling with a trained person who specialized in personality disorders. Green believed that it would be a long time before the children would be accepting of respondent and desire visitations. She thought that the children were "pretty much at the end of their own emotional rope right now." The children did not trust their mother, had told Green that they did not want to return to their parents, and wanted to stay with their foster parents where they could have a normal life.

The DHS caseworker, Jamie Breinager, testified that although respondent had completed parenting classes, she had not benefited from them. During supervised parenting time, respondent had to be redirected and reminded not to discuss certain topics with the children, and she continued to bring in gifts and emphasize material items rather than engaging or interacting with the children. Breinager further testified that respondent brought her husband to one of the children's concerts—which was not approved by the caseworker—represented to the child that he was respondent's employer, and had the child hug him which upset the child. Respondent also had not completed individual counseling although Breinager had advised her about the results of her psychological evaluation which indicated a personality disorder. Further, respondent's home study was denied as unsuitable because respondent had not provided the household income, neither her husband nor his son were made available for an interview, and the criminal background check on respondent's husband showed a previous criminal record. Breinager also advised the court that the children were refusing to go to parenting time, did not want to return to respondent, and wished to remain with their foster parents.

Respondent testified that she married Respecki on March 17, 2017. She had known him for 14 or 15 years but had not kept in contact with him that entire time. She knew that he committed criminal sexual conduct over 20 years ago, but he served time, completed counseling, and had no other legal issues since that time. They lived in a farmhouse and remodeled the upstairs in anticipation of the children coming to live with them. She was able to work from home so the children would never be alone with her husband as she understood that they were uncomfortable with him but he posed no danger to the children. She had recently been diagnosed with a mild personality disorder and had her first counseling session in that regard. She completed parenting classes and believed that she benefited from them, including by learning about different coping skills. She had been completing random drug and alcohol screens since the court took jurisdiction and was not aware of any failed tests. She admitted that she did not tell the children the nature of her relationship with her husband, but she felt that they already had too much stress. Respondent admitted that the court had given her more than enough chances to prove herself, but she asked the court to keep her parental rights intact and give her the opportunity to complete the individual counseling for this new personality disorder diagnosis. She was not willing to terminate her marriage for the sake of the children because that would not be beneficial to the children. She had a stable job, a happy and healthy marriage, a stable home life, a reliable vehicle, was in counseling for the specific issue she was diagnosed with, and had negative drug screens for two years—but she could understand why the children would want to have limited contact with her.

Following the testimony, the court issued its opinion from the bench finding that all of the statutory grounds, i.e., MCL 712A.19(b)(3)(c)(*i*), (c)(*ii*), (g), and (j), had been proved by clear and convincing evidence. The court made particular mention of the report by Neumann and concluded that Respecki's lack of knowledge regarding his wife's issues and history before they were married caused the court serious concern as to the potential risk of placing minor children in their care. The court also referred to findings set forth in the psychological report of Dr. Harold Sommerschield which concluded that respondent had a mild personality disorder. The court was persuaded by Green's testimony that it was going to take an extensive period of time for respondent to address her personality disorder which had caused her to make so many bad decisions. The court noted that, while respondent participated in several services, the real issue in this case was whether she benefited from them. And it appeared that respondent had not benefited from them as evidenced by the fact that respondent was in the middle of these proceedings when she got married—and to a man who is on the sexual offender registry.

Accordingly, the court proceeded to the best interests hearing at which time all of the children testified that they did not want to return to respondent and wanted to stay with their foster parents with whom they felt safe. The children understood that they would not be seeing respondent until they were grown up if respondent's rights were terminated and that was fine with them. The DHS caseworker testified that it was in the best interests of the children to terminate respondent's parental rights because she had not benefited from the services provided and had sufficient time to do so. Following the testimony, the court concluded that there was more than a preponderance of the evidence that termination of respondent's parental rights was in the best interests of each of the children. This appeal followed.

Respondent argues that the trial court erred in finding that any of the statutory grounds for terminating her parental rights were established by clear and convincing evidence. We disagree.

To terminate parental rights, the trial court must find at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination. MCR 3.977(K); *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). If a statutory ground for termination is established, the court must terminate parental rights if it finds that termination is in the child's best interests. MCL 712A.19b(5). The trial court's determination that termination is in the child's best interests is also reviewed for clear error. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

Respondent's parental rights were terminated under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), which provide:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court did not clearly err when it terminated respondent's parental rights to her children under these statutory grounds.

When the children were removed from respondent's care in November 2015 respondent had housing issues, a substance abuse problem, had not been sending the children to school or properly caring for them, was in possession of heroin while with the children, and was facing criminal charges and jail time. Clearly, respondent was acting without regard for the care, well-being, and safety of her children. Respondent was ordered to comply with a number of services, including parenting classes, substance abuse treatment and random drug screens, psychological evaluation and individual counseling, as well as to obtain and maintain a legal source of income and suitable housing. During the course of these proceedings, respondent did appear to successfully address her substance abuse problem. However, there was significant evidence establishing that, while respondent participated in parenting classes, she failed to benefit from them by properly interacting with the children during supervised visitations. Further, instead of making the visitations with her children an enjoyable experience, respondent was rude to the children and the supervising case worker to such an extent that the children requested that visitations be stopped in January 2017. Consequently, the court ordered that the visitations be supervised by a counselor in an additional effort to promote respondent's visitation time.

Respondent's actions during the pendency of these proceedings further demonstrated that she was still making bad decisions, exercising poor judgment, and placing her own needs above the needs of her children almost two years after the children were placed in foster care. At a hearing conducted on March 2, 2017, respondent advised the court that she had moved into a bigger home which she was leasing with the option to purchase, and that she worked full time for

Cherry Capital Services. What respondent failed to mention to the court was that she was going to marry the owner of that home, who was also her employer, in 15 days—on March 17. And respondent failed to advise the court that her future husband was a convicted sex offender who was on the sex offender registry and that he had a young son who lived with them. Instead of respondent disclosing this important information to the court, these facts were learned during a home study conducted by DHS—which was denied as unsuitable. The children also discovered some of this information on their own before respondent told them and before DHS had an opportunity to prepare them to receive the information. Consequently, the children felt deceived, disappointed, resentful, and fearful.

It appears that respondent was also less than forthcoming about herself to her husband, Respecki, who told Neumann during a risk assessment conducted in June 2017—months after he married respondent—that he did not know about respondent's criminal or substance abuse histories, or about these DHS proceedings and that respondent was at risk of having her parental rights terminated. Neumann was seriously concerned, as was the DHS caseworker and lower court, that respondent and Respecki could get married without sharing or knowing these extremely significant details. Respondent's decision to marry someone, particularly with Respecki's criminal history, in the middle of these proceedings where her parental rights were at stake illustrates, at least, that she continues to exercise poor and irresponsible judgment. And to further complicate the matter is the fact that respondent's housing and livelihood wholly depend on her continued relationship with Respecki. In other words, if this relationship faltered, respondent would be homeless and jobless—just as she was when these proceedings were commenced. It was clear during these proceedings that the assistant prosecuting attorney and the DHS caseworker wanted respondent to sever her relationship with, and thus end her marriage to, Respecki because the children were scared to live in a house where he lived. Respondent refused to consider this solution, likely because her home and livelihood depended on her continued relationship with Respecki. But in any case, despite respondent's extensive DHS history which dates back at least to 2011, respondent's actions continue to demonstrate that the children's needs are secondary to her own. Accordingly, considering the record evidence, we conclude that at least one of the statutory grounds for termination relied upon by the lower court was established by clear and convincing evidence. See *In re Olive/Metts*, 297 Mich App at 40.

Next, respondent argues that the lower court erred in concluding that termination of her parental rights was in the children's best interests. We disagree.

In determining whether termination of parental rights is in a child's best interests, the court may consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home[.]" *Id*. at 41-42 (internal citations omitted). The court may also consider a parent's visitation history, psychological evaluations, the child's age, and a parent's history as well as involvement in domestic violence. *In re White*, 303 Mich App at 714; *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009). A preponderance of the evidence must establish that termination is in the child's best interests. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

In this case, all four children—who were 15, 12, and 11 years old—testified that they did not want to be returned to respondent's care and custody, and that they wanted to stay with their

foster parents so that they could have a permanent, safe, and stable home, as well as a normal life. Their testimony was clear, consistent, and convincing. They believed that respondent's parental rights should be terminated and knew that meant no contact with her until they were grown—which was fine with them. It is clear from their testimonies that their bond to respondent was significantly diminished by their disappointments over the years and did not outweigh their strong desire for permanency, safety, and stability—which they found living in their foster home. See *In re Olive/Metts*, 297 Mich App at 41-42. Further, the children had all refused to attend visitation with respondent and Green testified that the children were "pretty much at the end of their emotional rope right now." Considering the evidence, we agree with the lower court that a preponderance of the evidence established that termination of respondent's parental rights was in the children's best interests. See *In re Moss*, 301 Mich App at 90.

Affirmed.

/s/ Peter D. O'Connell
/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto